IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT NICASTRO, | : |
|     Plaintiff | : |
|        v. | : Case No. 3:15-cv-182-KRG-KAP |
| P. JOEL RITCHEY, *et al.*, | : |
|     Defendants | : |

<u>Report and Recommendation</u>

Recommendation

I recommend that the defendants' pending motion for summary judgment, ECF no. 19, be granted. There are two claims in this matter, a First Amendment Establishment Clause claim and a First Amendment retaliation claim. Neither can be submitted to a jury.

Report

*Rule 56*

A party moving for summary judgment bears the initial burden of pointing the district court to the basis in the record for its argument that there is no genuine issue of material fact. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party does so, Fed.R.Civ.P. 56 then obliges the party opposing summary judgment to show by competent evidence that there is a genuine factual dispute, that is, that sufficient evidence exists so that a reasonable jury applying the relevant law could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986). Where there is a factual dispute, all reasonable inferences must be drawn in favor of the nonmoving party, in this case the plaintiff. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

*Retaliation*

The First Amendment retaliation claim was first recognized in <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000) and fleshed out in <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir.2001) and <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003). It expanded the cause of action previously recognized for infringement on a person's access to court. A retaliation claim in the prison context requires an inmate plaintiff to show: (1) the inmate's conduct -typically the filing of a grievance- that was constitutionally protected; (2) an adverse action at the hands of prison officials that would deter a reasonable inmate (one of "ordinary firmness") from continuing in or repeating that conduct; and (3) a causal connection between the conduct and the adverse action, that is that the

1

constitutionally protected conduct was a substantial or motivating factor for the adverse action. Causation can be negated by proof that prison personnel would have taken the adverse action regardless of the protected conduct for reasons reasonably related to a legitimate penological interest.

In 2016, Watson v. Rozum, 834 F.3d 417 (3d Cir. 2016), a split panel of the Court of Appeals expanded the protected conduct element of a retaliation claim to include threats to file a grievance, the majority observing that "we cannot discern a substantive distinction between retaliation for informing prison officials of an intent to file a grievance or requesting the necessary forms to do so on the one hand, and actually filing such a grievance on the other." 834 F.3d at 423. The Seventh Circuit has held to the contrary. Bridges v. Gilbert, 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a threat to file a grievance would itself constitute a First Amendment-protected grievance"). As the Eastern District of Pennsylvania has observed, after Watson courts in this Circuit still generally grant summary judgment to the prison official unless the prisoner adduces evidence the prison official knew of the prisoner's intent to file a grievance, Medina v. Hallman, 2021 WL 2577169, at *4 (E.D. Pa. June 23, 2021), because as Judge Baxter of this court put it, it puts the cart before the horse to imagine that adverse activity preceding the grievance can be caused by the grievance. Marten v. Hunt, 2009 WL 1858257, at *6 (W.D. Pa. June 29, 2009).

Before Watson v Rozum, in the time frame of the alleged retaliation alleged by Nicastro, there certainly was healthy evidence that the future filing of grievances was not protected activity, most notably Magistrate Judge Kelly's opinion for this court in Ortiz v. Baird, 2013 WL 1290555, at *8–9 (W.D. Pa. Feb. 15, 2013), *adopted*, 2013 WL 1314697 (W.D. Pa. Mar. 28, 2013):

> Indeed, courts have held that the mere "threat to file a prison grievance does not satisfy the first element of a retaliation claim." Griffin–El v. Beard, 2013 WL 228098, at *8 (E.D.Pa. Jan.22, 2013). See Stewart v. Varano, 2011 WL 3585409, at * 1 (M.D.Pa. Aug.15, 2011) (threatening to file grievance is not protected activity for First Amendment retaliation purposes); Hunter v. Bledsoe, 2010 WL 3154963, at *4 (M.D.Pa. Aug.9, 2010) ("The difficulty here for Plaintiff is that he only threatened to file a grievance; he did not actually file one. Since Plaintiff's conduct did not actually involve the exercise of a constitutional right he fails to satisfy the first element of a retaliation claim ...."); Bendy v. Hutler, 2007 WL 87632, at * 2 (D.N.J. Jan.9, 2007), aff'd, 341 F.App'x 799 (3d Cir.2009) ("Plaintiff failed to plead that he filed a grievance against [Defendant], rendering his allegations fatally flawed for want of a constitutionally protected activity or that such activity motivated [Defendant's] acts"). See also Bridges v. Gilbert, 557 F.3d 541, 554–55 (7th Cir.2009) ("it seems implausible that a threat to file a grievance would itself constitute a First Amendment-protected grievance") (emphasis in original); Hunter v. Bledsoe, 2010 WL 3154953, at * n. 8Hunter v. Bledsoe, 2010 WL 3154953, at * n. 8 (finding no

Third Circuit cases that hold mere threat to file prison grievance satisfies first element of a retaliation claim).

Because Plaintiff in this case did not actually file a grievance against Kalwasinski but merely threatened to do so, he did not engage in constitutionally protected activity in the first instance.

*Immunity*

Prison officials, like government actors generally, have a qualified immunity from damages claims unless they violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. The contours of that right must have been sufficiently definite that any reasonable official would have understood them. San Francisco v. Sheehan, 575 U.S. 600, 611 (2015). Either a Supreme Court decision or a "robust consensus" of circuit opinions might clearly establish a legal right. *See Id*. 575 U.S. at 617.

*Exhaustion of administrative remedies*

The Prison Litigation Reform Act, as codified at 42 U.S.C. § 1997e(a), requires an inmate to exhaust the available avenues for relief within a prison's administrative or grievance system before filing a lawsuit. Booth v. Churner, 532 U.S. 731, 733–34 (2001). Exhaustion requires compliance with the applicable procedural rules of that system. Woodford v. Ngo, 548 U.S. 81, 88 (2006). Failure to comply constitutes a waivable procedural default of a claim. *See* Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir.2004).

Exhaustion is claim specific: exhausting one claim does not excuse failure to exhaust a different claim even if it is factually related. *See* Boyd v. United States, 396 Fed.Appx. 793, 795 (3d Cir. 2010). *See also* Stewart v. Kelchner, 358 Fed.Appx. 291, 296–97 (3d Cir.2009)("Stewart complained only of the allegedly inadequate medical treatment he received for his MRSA infection. Stewart did not make any reference to the allegedly unsanitary and overcrowded conditions that he claims gave rise to the alleged MRSA epidemic, or to any other action that he attributes to Kelchner in this § 1983 action. ... The District Court therefore appropriately granted summary judgment in Kelchner's favor on this unexhausted claim.")

*Establishment*

The First Amendment's Establishment Clause applies in so many contexts that trying to set out a compact list of the elements of a claim is more misleading than enlightening. The basic rule is that government at any level, including prison management, cannot favor one religion over another, or religion over irreligion. *See* Fields v. Speaker of Pennsylvania House of Representatives, 936 F.3d 142, 153 (3d Cir. 2019), *quoting* McCreary County v. ACLU of Kentucky, 545 U.S. 844, 875 (2005). Factual

and historical contexts matter, as does the inevitable problem that the attempt to prevent any objector's discomfort with religious references would result in a heckler's veto and a civil religion that scrubs government speech of "any but the most generic reference to the sacred," which itself would be a forbidden exercise. Town of Greece, N.Y. v. Galloway, 572 U.S. 565, 581 (2014)(and note its cite to Justice Goldberg's observation that "untutored devotion to the concept of neutrality" must not lead to "a brooding and pervasive devotion to the secular.")

One thing is crystal clear: coercion of religious practice and indoctrination are forbidden, Town of Greece, N.Y. v. Galloway, 572 U.S. at 586, but offense at a religion or a reference to its tenets "does not equate to coercion." Town of Greece, N.Y. v. Galloway, 572 U.S. at 589.

*Procedural history*

Robert Nicastro was from about January 2013 until April 2017 in the custody of the Pennsylvania Department of Corrections at S.C.I. Laurel Highlands on five concurrent sentences imposed by the Courts of Common Pleas of Dauphin, Lancaster, and Mercer, after Nicastro pleaded guilty in each of the three counties to Driving Under the Influence of Alcohol; he also pleaded guilty to a count of driving while his license was suspended (DUI-related) in Lancaster County, and pleaded *nolo contendere* to a charge of resisting arrest in Mercer County. His sentences aggregated to a maximum of five years, with a projected maximum date in late November 2017.

When his minimum sentence had expired, Nicastro filed a petition for a writ of habeas corpus in June 2014 at Nicastro v. Pennsylvania Board of Probation and Parole, Case No. 2:14-cv-732-CRE (W.D.Pa. October 7, 2014), *certificate of appealability denied*, No. 14-4474 (3d Cir. June 4, 2015). Nicastro's petition was based on his assertion that his continued custody violated the Due Process Clause, because the Board of Probation and Parole (Board) had granted him parole in the summer of 2013 upon completion of a drug and alcohol treatment program (known as "Therapeutic Community" or "TC"), then rescinded parole in the fall of 2013 when Nicastro was failed from Therapeutic Community. According to Nicastro, he had been promised that his parole would not be rescinded, only postponed pending successful completion of TC. Nicastro re-entered TC in November 2013 and successfully completed the program on February 28, 2014. However, when Nicastro was next interviewed for parole, the Board denied him parole. According to Nicastro, the Board's hearing examiner focused almost exclusively on the TC failure and disregarded the subsequent TC completion. Nicastro referred to this as a conspiracy by the Board and DOC personnel to retaliate against him for his personal beliefs concerning religion and recovery. Nicastro argued that this violated the "impermissible reasons" doctrine of Block v. Potter, 631 F.2d 233, 236 (3d Cir. 1980).

Magistrate Judge Eddy denied the petition as moot based on the uncontested fact that three days after the Board denied Nicastro parole on April 8, 2014, Nicastro signed a "Request to Serve the Maximum Expiration of Current Sentence," waiving any further parole consideration. Judge Eddy noted in the alternative that Nicastro had failed to show any due process violation. The Court of Appeals' denial of a certificate of appealability was a mirror image of Judge Eddy's decision: the appellate panel denied review on the basis that the due process claim was "meritless" and there was no need to address the mootness issue.

The denial of review to the habeas petition was in June 2015. Beginning in July 2015, Nicastro filed several successive civil rights complaints claiming that various Board and DOC personnel were liable to him for the denial of parole and for the antecedent expulsion from TC.

This case began with Nicastro's complaint alleging that eight employees of the DOC violated his rights because the reason he was discharged from TC in August 2013 was that he publicly announced that TC was a "faith based cult" and being required to participate in it violated his religious liberty. After screening the complaint as required by the Prison Litigation Reform Act I recommended that the complaint be served on defendant Ritchey, who had terminated Nicastro from TC on August 27, 2013, and on defendant Earnesty, who had written what Nicastro alleged was a "false and malicious evaluation," because as to them it alleged the claim of retaliation for the exercise of First Amendment rights. I recommended that the other six defendants be dismissed without leave to amend because their only alleged involvement in events was their mere presence or their roles as part of the grievance process; I also recommended that a tag-along claim of racial discrimination be dismissed as frivolous.

There were no objections and the complaint proceeded to service on Ritchey and Earnesty, and after a discovery schedule was established the two defendants filed a motion for summary judgment in September 2016, to which Nicastro filed a timely response. No action was taken on my Report and Recommendation in Case No. 3:15-cv-182-KRG-KAP.

In September 2015, Nicastro filed a second complaint, <u>Nicastro v. Mailman,</u> Case No. 3:15-cv-247-KRG-KAP (W.D.Pa. October 29, 2015), also relating to his discharge from TC, naming a defendant also named in the first complaint, William Mailman, the deputy warden for Centralized Services at Laurel Highlands, and Mario Dirienzo, the parole supervisor there. Nicastro alleged in what I found to be a loose and conclusory claim of conspiracy that Mailman and Dirienzo were directly involved in his termination from TC. I recommended that the complaint be dismissed for failure to state a claim, and because the matter was obviously related to Case No. 3:15-cv-182-KRG-KAP that any amended complaint be filed at and consolidated with the one

5

pending at Case No. 3:15-cv-182-KRG-KAP. No objections were filed to this recommendation and the Court adopted the recommendation in No. 3:15-cv-247-KRG-KAP in October 2015. Nicastro filed his amended complaint, styled "Proposed Amended Complaint," at ECF no.18 in Case No. 3:15-cv-182-KRG-KAP, nine months later in August 2016, just before Ritchey and Earnesty filed their motion for summary judgment.

Screening the proposed amended complaint together with the original complaint against Mailman and Dirienzo, Nicastro added the allegations that: 1) there is no appeal from TC termination; 2) Nicastro nevertheless filed a grievance with Mailman requesting to be given completion status; 3) Mailman met with Ritchey on the day Ritchey terminated Nicastro from TC; 4) and Mailman denied Nicastro's grievance seeking certification that he had successfully completed TC. As for Dirienzo, Nicastro alleged that Dirienzo had contributed "input and information" that Mailman used in deciding to deny Nicastro's grievance. According to Nicastro's amended complaint, this alleges Mailman and Dirienzo were directly involved in his termination from TC.

The original complaint, ECF no.2 in Case No. 3:15-cv-247-KRG-KAP, with the additional allegations added in August 2016, together fail to allege a plausible claim against either Mailman or Dirienzo. Mailman's refusal to overturn Ritchey's decision (especially in what Nicastro alleges was a procedurally unauthorized attempt at getting around the lack of appeal from Ritchey's decision) after the fact does not allow a claim against him as if he made Ritchey's allegedly wrongful decision, and claiming that the two "met" on the day Ritchey made his decision is insufficient to imply influence on Ritchey, much less that Mailman made Ritchey's decision. As for Dirienzo, his input into Mailman's after-the-fact refusal to overturn Ritchey's decision likewise does not make him factually or legally a cause of Ritchey's decision.

Nicastro filed a timely response to Ritchey and Earnesty's motion for summary judgment in October 2016. Nicastro, notably, does not mention Mailman and Dirienzo in his account of the facts that he alleged showed a genuine issue for trial against Ritchey and Earnesty, but he did comment that there had been additional retaliation by "DATS Frieri and Fazzini" in the fall of 2013 during Nicastro's participation in the second TC, and that "this will be an issue for trial." ECF no. 23 in Case No. 3:15-cv-182-KRG-KAP, at 6.

In December 2015, Nicastro filed a civil rights complaint *sub nom*. Nicastro v. Borosky, Case No. 3:15-cv-326-KRG-KAP (W.D.Pa. January 26, 2016), alleging that he and other inmates were inadequately fed, an allegation Nicastro had raised in grievance paperwork filed a year and a half earlier between May and July 2014. I recommended that the complaint be dismissed, and over Nicastro's objections the Court dismissed the complaint in January 2016.

Also in January 2016, Nicastro filed a civil rights complaint *sub nom.* <u>Nicastro v. Stepien,</u> Case No. 3:16-cv-3-KRG-KAP (W.D.Pa. July 27, 2016) against a corrections officer who allegedly took Nicastro's legal work and threatened Nicastro, and against a security captain who Nicastro alleged failed to return the legal work in its entirety and falsely issued a misconduct against Nicastro alleging that part of the legal work was "death threats." Nicastro withdrew that complaint in July 2016. The complaint had noted that another civil rights complaint challenging the misconduct and the hearing on it would be forthcoming.

That complaint was not filed, but another challenge to a different hearing was. The second complaint Nicastro filed in January 2016 was a civil rights complaint against the Board's hearing examiner who had conducted the parole hearing in February 2014. <u>Nicastro v.</u> Gabonay, Case No. 3:16-cv-27-KRG-KAP (W.D.Pa. June 7, 2016). Nicastro alleged, as he had done in his habeas petition, that Gabonay had violated his due process rights and the First Amendment. The theory of the First Amendment claim was different: Nicastro asserted that Gabonay violated his religious free exercise rights by making a threat ("what are you going to do when we make you go to AA on the street?") when Nicastro asserted his right not to participate in that program. The Court dismissed the complaint in June 2016 over Nicastro's objections to my recommendation. In Nicastro's objections, ECF no. 6 in Case No. 3:16-cv-27-KRG-KAP, Nicastro again commented that there had been "retaliation by "DATS Fazzini and DATS Frieri during the second TC [that] will be revealed fully during trial at Nicastro v. Ritchey." Just to be clear, there has never been a complaint or even a proposed complaint that I have seen that attempts to allege any claims against Frieri or Fazzini.

Before turning to the motion for summary judgment and the opposition to it themselves, it is important to clarify what is not in this case. In the complaint filed in <u>Nicastro v. Stepien,</u> Case No. 3:16-cv-3-KRG-KAP, Nicastro alleged that an unnamed inmate acting "in concert with others" (also unnamed) attacked Nicastro in his cell. There is nothing in that withdrawn complaint that connects the attack to the defendants in that case. In correspondence filed in this case, Nicastro has mentioned other events that I do not understand and certainly are not connected to this matter, *see e.g.* ECF no. 42, "This Court purposely publicly parroted an unspeakable moniker used by my abusers as part of their assaults and torture. This court had me arrested at gunpoint;" ECF no. 44, "The AG's assertion … portends rape, repeated assaults and torture, theft of evidence, falsification of documents resulting in over a year of solitary confinement, flouting judges and lawyers to illegally imprison me for 4 ½ years and the resultant severe chronic PTSD." Nicastro also refers to <u>Nicastro v. McMullen</u>, Case No. 5:21-cv-3176-GEKP (E.D.Pa.) as "further evidence of retaliation." Reading the pleadings in that case which is pending in the Eastern District of Pennsylvania, I can

see Nicastro makes further allegations about Stepien and the unnamed attacker, together with complaints about his treatment while on parole or probation. This case, however, deals with what is in the pleadings in this case, which can be described as two claims: 1) that Nicastro was wrongfully terminated from TC in 2013 for threatening to file a grievance and 2) the Establishment Clause was infringed upon by the features of TC that Nicastro claims make it a "faith based cult." This description is only fleshed out in Nicastro's pleadings as a claim that TC resembles some features of Alcoholics Anonymous' Twelve Step program, which is based on acknowledging "a Power greater than ourselves" and "God as we understood Him." Nicastro does not make any specific claim concerning his second stint in TC other than to point out his participation was agreed to by him based on his understanding that successful completion would result in parole.

*Facts*

The defendants' version of the facts is that Nicastro entered TC the first time in May 2013, after signing a consent form that stated, "By signing this form, I agree to meet all expectations and abide by all rules and regulations of the Therapeutic Community." Exhibit 2, ECF no 22-1. His performance in TC before his termination on August 27, 2013 was marked with staff notes reflecting dissatisfaction with Nicastro's participation. Exhibit 3, ECF no 22-1. There was a "peer encounter" on May 15, 2013 for what was perceived as defiant behavior, and a "learning experience" on July 26, 2013 in response to Nicastro's perceived lack of participation, after Nicastro used a speaking opportunity to relate his views about his personal freedom to drink alcohol and drive automobiles and that implied that DUIs (at least in the absence of death or injury) were victimless crimes. Nicastro turned in two assigned essays that also were inappropriate. Nicastro was given a termination warning on August 1, 2013, for what staff referred to as "playing cat and mouse games." On two occasions before his termination Nicastro told defendant Earnesty, his counselor, that he did not intend to quit drinking alcohol. The last straw was on August 26, 2013, an exercise in participating in a mock job interview. Exhibit 7, ECF no 22-1. According to the counselor, Nicastro made inappropriate answers to questions that mocked the seriousness of the interview in front of the other 15 inmates participating in the exercise.

Nicastro's version of the facts is in ECF no. 23, and elaborates the accounts in his grievances. At pages 25-26 of ECF no. 23, Nicastro presents one of the essays that was deemed to contain inappropriate material. One of its salient features is Nicastro's clear intent to continue drinking scotch. In other paperwork the adjustment Nicastro proposes to avoid future DUIs is to hire a driver, not to change his drinking habits. Nicastro describes the pressure to join AA as "relentless coercion" and asserts that staff

mistook his revulsion at having a "religion/cult" forced on him for defiance with the goal of recovery. Nicastro asserts that he was working hard at meetings with the secular Self-Management and Recovery Training (SMART) program but resisted Ritchey's pressure as "an active AA religious cult member" to participate in AA when paroled. According to Nicastro, AA requires abstinence, but SMART does not, and although he admits that he did publicly state that he intended to drink when paroled, this was not illegal, and his honesty was preferable to the lies of other inmates. Nicastro disputes every other detail of the August 26, 2013 interview, beginning with his alleged refusal to shake the counselor's hand. At page 33 of ECF no. 23, Nicastro presents his version of the interview. He admits to replying to the question "why did you leave your last client" (a question Nicastro recognized as designed to give the inmate an opportunity to broach the subjects of imprisonment and criminal record) with the false statement that it was due to dishonesty: "I lie on my invoices and cheat on my expense reports." According to Nicastro, this was not an attempt at humor, it was an attempt to have the counselor quickly dismiss him and move on to another inmate. The counselor did dismiss him shortly thereafter, and after a meeting with Ritchey and his Unit Manager, Ritchey did terminate him from TC the next day.

At pages 34 of ECF no. 23, Nicastro relates that when he was confronted by Ritchey and Unit Manager Cree after being expelled from the mock job interview, Cree asked if he felt "the staff was making this "personal"." Nicastro told him yes and that he was preparing a grievance to be filed after leaving TC documenting the infringements on his religious freedom.

Nicastro filed Grievance 474991 on the day he was terminated, August 27, 2013. It is available at Exhibit 4, ECF no. 22-1. The original grievance was a bare bones document stating only that Nicastro had completed all the program requirements; in appeals from the denial of the grievance Nicastro responded to the official version of facts asserting that he was terminated for his "beliefs and not [his] behavior." It does not allege retaliation for threatening to file a grievance. In Nicastro's final appeal Nicastro wrote that defendant Ritchey had told Nicastro he was being terminated to keep him "off the streets" because Ritchey believed him to be a "danger to the community" and Ritchey was "more than willing to sacrifice" Nicastro to get what he wants.

Nicastro filed Grievance 476065 on September 5, 2013. It is available at Exhibit 5, ECF no 22-1. It asserts that Nicastro's evaluation contains false information because Earnesty "lied in [Nicastro's evaluation]" in her description of Nicastro's speech about drinking and driving. It and Nicastro's subsequent appeals do not allege retaliation for threatening to file a grievance, or anything related to any religious aspect of TC.

Nicastro filed Grievance 477696 on September 16, 2013. It is available at Exhibit

6, ECF no 22-1. It asserts that Nicastro was terminated, essentially in violation of the Establishment Clause ("my constitutional right to freedom from state-established religion"), because TC was based on a belief in a higher power. Nicastro complained that he had been forced to read aloud to the participants in TC the "12 promises of recovery," including #11 which invoked God, and that every day started with the worship of God and a prayer to God. (It appears the text of #11 is "We will suddenly realize that God is doing for us what we could not do for ourselves." page 41, ECF no. 23.)

Nicastro's third grievance also does not allege retaliation for threatening to file a grievance. In it, Nicastro further complained that he was forced to remove a paragraph from an essay (not the one at page 25-26 of ECF no. 23) in which Nicastro suggested that religious belief was an emotional search for a "life-preserver" by the desperate, ending with the two sentences: "Put in this context, it is easy to see why the religious fervor that permeates AA's meeting and literature has gone unchallenged for so long. When you've lost faith in yourself it's only too easy to find it in something else." Nicastro added he had ten more examples but did not describe them. Responding to the grievance at the first step of the three step process, Mailman replied that Nicastro's termination from TC had nothing to do with religious freedom and noted that Dirienzo had emailed Mailman that stating that Nicastro had told Dirienzo that "if I don't win my grievance, my plan is to bring the entire therapeutic community program down and close it, not just here but the entire state."

Because the grievances were filed in quick succession the appeals from one grievance sometimes reference other grievances. In her final-level response to Nicastro's earliest grievance, Chief Grievance Officer Varner pointed out to Nicastro that the DOC had non-theistic (she wrote "non-spiritual") equivalents of TC - one of which was SMART - and there was no claim or evidence that prior to termination Nicastro had told anyone about his religious objections or that he had requested another self-help program. Exhibit 4, ECF no. 22-1.

*Discussion*

The habeas corpus petition is not discussed as a relevant factor by anyone. Does the Court of Appeals denial of review because the Block v. Potter claim was "meritless" have an issue or claim preclusive effect? I think it does, because the Establishment Clause claim here is essentially the same claim, namely that parole was denied for failure to cooperate with what Nicastro asserts was religious coercion. Because parole was denied for a variety of other reasons, it is conceivable that rejection of Nicastro's Establishment Clause claim was not essential to the Court of Appeals' denial of a certificate of appealability, but the Court of Appeals' decision and Nicastro's waiver of parole consideration certainly limit any damages claim Nicastro could make. Nicastro cannot

claim lost wages and other consequential damages from the denial of parole because that has been held not to be wrongful, and Nicastro's waiver of parole consideration also breaks any causal connection between the denial of parole and his damages. At best, Nicastro is limited to a nominal damages claim that religious coercion existed in the TC program, and a claim for consequential damages between the date parole was rescinded and Nicastro's waiver of further parole consideration.

Second, the only claim Nicastro can make is that religious coercion existed in the TC program. He cannot claim to have been terminated from the program for threatening to file a grievance. A jury could accept Nicastro's statement that he notified Ritchey on August 26, 2013, that Nicastro intended to file a grievance. Until at least three years later when Watson v. Rozum was decided, however, Ritchey would have no basis for thinking that any threat of a grievance was protected activity. Even now there is hardly a robust consensus on the point. Ritchey is protected by qualified immunity.

Ritchey is also protected by the exhaustion doctrine. The only claim arguably raised and exhausted in Nicastro's grievances or addressed in the grievance process was Nicastro's claim that he was expelled from the TC program for protesting its religious aspects.

With respect to the Establishment Clause claim, Nicastro does not claim that he was unaware of non-theistic alternatives like SMART. Indeed, one of his complaints is that he was actively working through the SMART program at the same time and should have been approved for parole regardless of the TC program. But it is not a violation of the Establishment Clause for the DOC to have a theistic program for drug and alcohol treatment for its inmates who accept theistic religious beliefs.

First, a rehabilitative program that acknowledges a tenet that aligns with some religious beliefs is not itself a religion. The DOC's provision of religious services for inmates is not itself a religion, nor is its payment to ministers or its accommodation of free exercise claims (to halal food, to wearing religious artifacts, etc.) an establishment of religion. If that were the case, no program could be devised that is not an establishment of religion since the concepts of guilt, punishment, rehabilitation as a goal, and the capacity to be rehabilitated are equally religious concepts as monotheism, if not more so, since there are numerous religions without God, but none without right and wrong.

Second, and equally dispositive, there is no evidence of coercion. Nicastro claims that he had to chant the TC slogan, sit through a speaker who spoke about Christianity, and give a five minute talk about a religious poem. Page 42 at ECF no.23. Nicastro cannot participate in a theistic program and complain about its theistic aspects any more than he could go to Islamic or Christian worship and complain of an Establishment Clause violation because they were espousing Islam or Christianity there. If Nicastro had

produced evidence that he was coerced into going to TC, that would be a different story. But Nicastro's disappointed hope that participation in TC would help him obtain parole does not constitute coercion as that term is legally understood. The adverse consequences an inmate might face for participation in a therapeutic program in which he might incriminate himself are not coercion. McKune v. Lile, 536 U.S. 24, 38 (2002). The benefits that an inmate might expect to receive from participating in TC, in light of nontheistic alternatives, likewise do not rise to the level of coercion. *Compare* Jackson v. Nixon, 747 F.3d 537, 540 (8th Cir. 2014)(atheist inmate refused a transfer to a secular treatment program stated an Establishment Clause claim.)

To accommodate Nicastro's religious belief -or after the fact to allow a damages claim on the theory that Nicastro's religious belief had to be accommodated *eo instante* within the TC program- would rewrite the TC program and impair whatever benefit the DOC believes it provides, and is no alternative at all. *Compare* Searcy v. Simmons, 299 F.3d 1220, 1229 (10th Cir. 2002)(inmate who could not participate in rehabilitative program because he refused to admit responsibility for a criminal offense, which he claimed would be a lie contrary to his religion, did not have a free exercise claim due to prison's refusal to waive the admission of responsibility requirement.)

Pursuant to 28 U.S.C.§ 636(b)(1), the parties can within fourteen days file written objections to this Report and Recommendation. In the absence of timely and specific objections, any appeal would be severely hampered or entirely defaulted. See EEOC v. City of Long Branch, 866 F.3d 93, 100 (3d Cir.2017) (describing standard of appellate review when no timely and specific objections are filed as limited to review for plain error).

DATE: August 16, 2022

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record and by U.S. Mail to:

Robert J. Nicastro
315 South Broad Street, Unit #1126
Philadelphia, PA 19107